**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION - DAYTON**

| | | |
|---|---|---|
| **BRANDI BOOTH** | : | **Case No.** |
| **c/o RITTGERS & RITTGERS** | : | |
| **12 East Warren Street** | : | **JUDGE** |
| **Lebanon, Ohio 45036** | : | |
| *as Administratrix of the Estate of Dustin* | : | <u>**COMPLAINT AND JURY DEMAND**</u> |
| *L. Booth* | : | |
| | : | |
| **Plaintiff,** | : | |
| **v.** | : | |
| | : | |
| **JONATHAN LAZZARA, DO** | : | |
| **904 Scioto Street** | : | |
| **Urbana, Ohio 43708** | : | |
| | : | |
| **and** | : | |
| | : | |
| **ATRIUM MEDICAL CENTER** | : | |
| **One Medical Center Drive** | : | |
| **Middletown, Ohio 45005** | : | |
| | : | |
| **and** | : | |
| | : | |
| **ROBERT BUCHANAN** | : | |
| **601 S. Main Street** | : | |
| **Monroe, Ohio 45050** | : | |
| *Individually and in his Official Capacity* | : | |
| *as Chief of the Monroe Police* | : | |
| *Department* | : | |
| | : | |
| **and** | : | |
| | : | |
| **MIKE ROSENBALM** | : | |
| **601 S. Main Street** | : | |
| **Monroe, Ohio 45050** | : | |
| | : | |
| | : | |

*Individually and in his Official Capacity* :
*as a Lieutenant of the Monroe Police* :
*Department* :
  :
**and** :
  :
**BRIAN CURLIS** :
**601 S. Main Street** :
**Monroe, Ohio 45050** :
*Individually and in his Official Capacity* :
*as a Captain of the Monroe Police* :
*Department* :
  :
**and** :
  :
**CALEB PAYNE** :
**601 S. Main Street** :
**Monroe, Ohio 45050** :
*Individually and in his Official Capacity* :
*as a Sergeant of the Monroe Police* :
*Department* :
  :
**and** :
  :
  :
**FRED DOUGHMAN** :
**601 S. Main Street** :
**Monroe, Ohio 45050** :
*Individually and in his Official Capacity* :
*as an Officer of the Monroe Police* :
*Department* :
  :
**and** :
  :
**AARON LEDFORD** :
**601 S. Main Street** :
**Monroe, Ohio 45050** :
*Individually and in his Official Capacity* :
*as an Officer of the Monroe Police* :
*Department* :

**And**                                      :

                                             :

**DREW ASPACHER**                            :

**601 S. Main Street**                       :

**Monroe, Ohio 45050**                       :

*Individually and in his Official Capacity*  :

*as an Officer of the Monroe Police*         :

*Department*                                 :

                                             :

**And**                                      :

                                             :

**CITY OF MONROE, OHIO**                     :

**233 S. Main St.**                          :

**Monroe, OH 45050**                         :

                   **Defendants.**

---

Now comes Plaintiff, Brandi Booth ("Brandi"), as Administratix of the Estate of Dustin L. Booth ("Plaintiff"), by and through counsel, and for her Complaint states as follows:

## PRELIMINARY STATEMENT

1.        This medical malpractice, civil rights, wrongful death, survivorship and disability action challenges: a) Defendants' failure to properly diagnose and treat Dustin L. Booth ("Dustin") while he was hospitalized at Atrium Medical Center from February 1, 2022 to February 7, 2022; b) Defendants' unconstitutional stop and seizure of Dustin, an individual whom Defendants knew to be having a mental health crisis, on February 11, 2022; c) Defendants' use of excessive force against Dustin which ultimately resulted in his death; and d) Defendants' discrimination against Dustin based on his disability. Plaintiff brings this action as Administratrix of Dustin's estate to secure fair compensation for the pain and suffering endured by Dustin prior to his death and for the loss of income, benefits, society, support, services, companionship, care, assistance, attention,

protection, advice, guidance, counsel, instruction, training, and education, and prospective inheritance.

## PARTIES

2.      Brandi is Dustin's wife and Administratix of his estate.

3.      Defendant Jonathan Lazzara, DO ("Lazzara") is a medical doctor duly licensed to practice medicine within the State of Ohio and who specializes in the treatment of psychiatric patients. Lazzara's practice is located in Urbana, Champaign County, Ohio within the Dayton seat of this Court.

4.      Defendant Atrium Medical Center ("Atrium") is a nonprofit corporation organized and existing under the laws of the State of Ohio which holds itself out to the public as a provider of healthcare services, including psychiatric services.

5.      Defendant Robert Buchanan ("Buchanan") is, and was at all times relevant to this action, the Chief of the Monroe Police Department ("MPD"). As Chief of the MPD, Buchanan is a policy maker. Buchanan is also a "person" as defined by 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law. He is being sued in both his official capacity as Chief of the MPD and in his individual capacity.

6.      Defendant Mike Rosenbalm ("Rosenbalm") is, and was at all times relevant to this action, a Lieutenant with the MPD. As a Lieutenant, Rosenbalm is a policy maker. Rosenbalm is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law. He is being sued in his official capacity and individual capacity.

7.      Defendant Brian Curlis ("Curlis") is, and was at all times relevant to this action, a Captain with the MPD. Curlis is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law. He is being sued in his individual and official capacity.

4

8. Defendant Caleb Payne ("Payne") is, and was at all times relevant to this action, a Sergeant with the MPD. Payne is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law. He is being sued in his individual and official capacity.

9. Defendant Fred Doughman ("Doughman") is, and was at all times relevant to this action, an Officer with the MPD. Doughman is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law. He is being sued in his individual and official capacity.

10. Defendant Aaron Ledford ("Ledford") is, and was at all times relevant to this action, an Officer with the MPD. Ledford is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law. He is being sued in his individual and official capacity.

11. Defendant Drew Aspacher ("Aspacher") is, and was at all times relevant to this action, and Officer with the MPD. Aspacher is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law. He is being sued in his individual and official capacity.

12. Defendant City of Monroe, Ohio, is a municipality and political subdivision of the State of Ohio which operates a police force which employs the police chief and officer defendants named above.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over the dispute between the parties pursuant to 28 U.S.C. §§ 1331 and 1343(3) and (4) because Plaintiff's civil causes of action arise under the Constitution and laws of the United States, including but not limited to, 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the U.S. Constitution.

14. This Court also has supplemental jurisdiction to hear Plaintiff's related state law causes of action pursuant to 28 U.S.C. § 1367.

15. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because this Court sits in the district where Lazzara resides and practices medicine.

## FACTS

16. Plaintiff incorporates her previous allegations as if fully rewritten herein.

17. Dustin grew up in Monroe, Ohio, and some of the Defendants who played roles in his death knew him well.

18. In late January of 2022, Dustin became manic and irrational, emphatically stating that the earth was flat, that there was no Antarctica, and that there was a stairway to heaven.

19. He was passionate in his attempts to convince his family to believe him. He also believed he was a god, and confidently stated that the world would be much better when he is in charge, which would be imminently.

20. In the early morning hours of February 1, after a week of this consistently bizarre behavior, Brandi and Dustin's mother agreed that they needed to call the police to obtain help for Dustin's illness.

21. When the police arrived at Brandi and Dustin's home, Dustin sat on the ground and calmly explained his delusional theories to three officers, one of whom was Doughman.

22. A crisis intervention specialist arrived and confirmed that Dustin needed to be hospitalized.

23. Dustin was handcuffed without resistance and taken to Atrium where he was ultimately placed under the care of Lazzara, who was working in the hospital as either an employee or contractor.

24. Dustin remained in Atrium's behavioral health unit – and under the care of Lazarra – from February 1 to February 7, 2022 when he was discharged.

25. During his time at Atrium, and while under the care of Lazarra, Dustin continued his display of irrational behavior.

26. He also acknowledged and admitted that he had been using cannabis via a vape pen.

27. Brandi and Dustin's mother informed Atrium's agents upon admission that Dustin had been a heavy drinker until just two months prior to the admission, but had stopped drinking and switched to the vape pen. The further informed Atrium's agents that Dustin was using the vape pen constantly.

28. Atrium's employees and agents, including but not limited to Lazzara, negligently failed to administer and/or analyze essential testing, including but not limited to an Audit C, which would have revealed the extent of Dustin's dependence on substances.

29. During Dustin's time at Atrium, Lazzara failed to properly diagnose Dustin with cannabis use disorder or counsel him on ceasing to utilize the vape pen upon discharge.

30. In fact, when Dustin was discharged, Brandi was told that Atrium could not keep him any longer because he was not a threat to himself or others, and Dustin left without any scheduled follow-up mental health treatment or education on his proper diagnosis.

31. Brandi was ultimately told by Atrium personnel to call the police again if there were further incidents so that Dustin could then be "probated," meaning held by mental health care providers under the order of the probate court.

32. On February 9, 2022, two days after Dustin's discharge by Lazzara and Atrium, another incident occurred where Dustin smashed Brandi's cell phone with a hammer and MPD officers were again called.

33. MPD officers came to the home and Brandi and Dustin's mother both begged them to take Dustin back to the hospital.

34. MPD officers determined that Dustin had not done anything illegal and, since he was not a danger to himself or others, they could not take him to the hospital.

35. No crisis intervention specialist was called this time; rather, the police made the determination on their own.

36. In the few days after being discharged from Atrium, Dustin went on a shopping spree, including the purchase of a new pickup truck.

37. On Friday afternoon, February 11, around 2:00 p.m., Brandi was driving in their neighborhood when she saw Dustin at a stop sign in a new truck.

38. Dustin proceeded to get out of the truck and do a dance.

39. He then got back in the truck and drove through the neighborhood trying to give money to people and throwing money out the window.

40. He eventually went into a neighbor's garage for no apparent reason.

41. Upon seeing this concerning behavior, Brandi called 911 and told dispatch that Dustin was "a danger to himself or others," because that was the language she learned was necessary to get Dustin in-patient help.

42. MPD officers came to the Booth's neighborhood soon after the 911 call.

43. Aspacher was the initial officer to respond to Brandi's call for a welfare check.

44.    When he arrived in the neighborhood, Aspacher attempted to speak with Dustin, but Dustin drove on and instructed him to follow him to his house.

45.    When Dustin got to his home, Aspacher asked to speak with him, but Dustin refused and went into his home where he remained for about five hours.

46.    At the time Dustin entered the home, Aspacher was acting pursuant to a welfare check and did not have reasonable suspicion or probable cause that Dustin had committed a crime.

47.    During these approximately five hours, MPD officers remained positioned at various points outside of the home trying to get Dustin to come out.

48.    Eventually, the police elected to withdraw from the area and conspire to arrest Dustin.

49.    Buchanan, Rosenbalm, and Curlis (who had been at the Booth home that afternoon), all supervisors, met back at headquarters.

50.    During this meeting, they developed a plan to execute a high-risk traffic stop of Dustin if and when they could get him to leave the house.

51.    In developing this high-risk traffic stop plan, Buchanan, Rosenbalm, and Curlis, all knew that Dustin was a lawful concealed-carry gun owner and experiencing a mental health crisis.

52.    In developing this high-risk traffic stop plan, Buchanan, Rosenbalm, and Curlis, failed to, *inter alia*: a) select a safe location for the stop itself; b) take measures to ensure Dustin's safety when executing the traffic stop such as developing a secure perimeter; c) ensure no member of the public would be at risk when executing the stop; d) have mental health professionals on hand at the stop; e) implement de-escalation techniques; and f) develop any real plan at all for how the stop would be conducted.

53.     Payne, also a supervisor, arrived at MPD headquarters shortly after the plan was developed and was advised as to his role and responsibilities, which would be to be the operational supervisor of the stop.

54.     Payne was aware that Dustin was a lawful concealed-carry gun owner and experiencing a mental health crisis.

55.     Back at the Booth home, Dustin's friend, Justin Duh ("Duh") had arrived and was communicating with Ledford without Dustin's knowledge.

56.     Together, Duh and Ledford orchestrated a plan to get Dustin out of the house so the police could execute the high-risk traffic stop.

57.     Duh ultimately succeeded in getting Dustin to leave the house as a passenger in his vehicle.

58.     Before leaving the house, Duh communicated to Ledford that Dustin had a firearm on his person.

59.     Upon learning that Dustin was leaving the house with a gun, MPD Sergeant Eddie Myers, who knew Dustin very well on a personal level and who had been at the house earlier that afternoon communicating with Dustin, advised Rosenbalm to cancel the plan for the stop.

60.     Despite knowledge that Dustin was experiencing a mental health crisis and in possession of a firearm, Buchanan and Rosenbalm overruled Myers and instructed the officers to conduct the high-risk traffic stop.

61.     All officers involved in the high-risk traffic stop were similarly made aware that Dustin was experiencing a mental health crisis and in possession of a firearm.

62.     After Duh and Dustin drove away from the house, Payne's subordinates initiated the high-risk traffic stop at his instruction.

63.    At the time the traffic stop was initiated, there was no reasonable suspicion or probable cause to believe Dustin had committed any crime.

64.    Duh brought the vehicle to a stop and Dustin proceeded to exit the vehicle.

65.    As he exited the vehicle, no MPD officer had reasonable suspicion or probable cause to believe that Dustin had committed a crime.

66.    Dustin then proceeded to walk away from MPD officers with his hands in the air.

67.    As Dustin walked away from officers, none had reasonable suspicion or probable cause to believe that he had committed a crime.

68.    As Dustin walked away from officers, Myers confirmed and announced to all other officers that Dustin left the vehicle with a firearm in his possession, emphatically shouting, "Don't fight him, don't fight him."

69.    Despite such instructions from Myers not to engage with Dustin, Doughman – the MPD canine officer – released his dog with instructions to bite and take Dustin down. As he did so, Myers shouted, "No, no, no!"

70.    At the time Doughman released the canine officer, he had no reasonable suspicion or probable cause to believe that Dustin had committed a crime.

71.    Although the canine officer twice attacked Dustin, it was unsuccessful in efforts to take Dustin to the ground.

72.    Doughman immediately charged Dustin, an individual whom he knew was experiencing a mental health crisis and carrying a weapon, and went "hands-on" with Dustin.

73.    At the time Doughman went hands on with Dustin, he had no reasonable suspicion or probable cause to believe that Dustin had committed a crime.

74.     As Doughman grabbed Dustin, Dustin can be heard on body camera saying, "Listen to me, I don't want to hurt nobody."

75.     Doughman thereafter proceeded to throw Dustin to the ground.

76.     At the time Doughman threw Dustin to the ground, he had no reasonable suspicion or probable cause to believe that Dustin had committed a crime.

77.     The force used by Doughman against Dustin was excessive and used in the absence of any reasonable suspicion or probable cause that he had committed any crime.

78.     When Dustin got up from the ground, he was holding a handgun removed from his clothing and was then shot multiple times by Doughman, Payne, and three of Payne's subordinates.

79.     As a result of the gunshots, Dustin eventually died, but only after telling the officers he loved them.

## FIRST CAUSE OF ACTION
(Professional Negligence - Lazzara)

80.     Plaintiff incorporates her previous allegations as if fully rewritten herein.

81.     Lazzara owed a duty to provide care and treatment to Dustin within the appropriate standards of psychiatric care.

82.     Lazzara was negligent and departed from the applicable standards of care for a psychiatrist in his treatment of Dustin.

83.     Lazzara's departures from the applicable standard of care include, but are not limited to, the failure to properly diagnose Dustin with cannabis use disorder, failure to obtain a consultation from an addiction medicine specialist, and failure to instruct Dustin to cease use of any cannabis and continue psychiatric treatment upon his discharge from Atrium.

84.     As a direct and proximate result of Lazzara's negligence, Dustin continued to endure the emotional and psychological injuries which preceded his admission to Atrium in the first place and ultimately led to his death.

85.     As a further direct and proximate result of Lazzara's negligence, Brandi and Dustin's next of kin have and will continue to suffer the damages described above.

86.     An Affidavit of Merit is attached hereto.

## SECOND CAUSE OF ACTION
(Negligence – Atrium)

87.     Plaintiff incorporates her previous allegations as if fully rewritten herein.

88.     Atrium and its employees, agents, and/or contractors, including but not limited to Lazzara, owed a duty of reasonable care to Dustin.

89.     Atrium further had a duty to provide qualified personnel who were adequately trained and supervised to perform psychiatric services.

90.     Atrium further had a duty to use reasonable care in determining the qualifications and adequate performance of its contractors, agents and employees, including but not limited to Lazzara, who provide psychiatric services to patients within its facility.

91.     Atrium breached these duties and deviated from the acceptable standard of care by failing to provide appropriate medical care, treatment, and supervision to Dustin.

92.     As a direct and proximate result of Atrium's negligence, Dustin continued to endure the emotional and psychological injuries which preceded his admission to Atrium in the first place and ultimately led to his death.

93.     As a direct and proximate result of Atrium's negligence, Brandi and Dustin's next of kin have and will continue to endure the damages described above.

94.     An Affidavit of Merit is attached hereto.

## THIRD CAUSE OF ACTION

(42 U.S.C. § 1983 – Unlawful seizure and detention – Aspacher, Buchanan, Rosenbalm, Curlis, Payne, Ledford and Doughman)

95. Plaintiff incorporates her previous allegations as if fully rewritten herein.

96. At all relevant times herein, Buchanan, Rosenbalm, Curlis, Payne, Ledford, Aspacher, and Doughman were acting under color of law as agents and employees of the MPD.

97. On or about February 11, 2022, Aspacher, Payne, and Doughman intentionally seized and restrained Dustin against his will and without probable cause or reasonable suspicion to believe that he had committed a crime, pursuant to the plan developed by Buchanan, Rosenbalm Curlis and Ledford, acting in concert.

98. As a result of Aspacher, Payne's, and Doughman's intentional acts, Dustin was subjected to an unlawful seizure as he was unable to leave or terminate his encounter with the officers.

99. The intentional conduct of Payne, Aspacher, and Doughman described herein constituted a stop, seizure, and detention of Dustin amounting to an unlawful seizure within the meaning of the Fourth Amendment to the U.S. Constitution.

100. The intentional conduct of Payne, Aspacher, and Doughman described herein was unnecessary and completely unreasonable under the circumstances, not justified according to law, including but not limited to the Fourth Amendment to the U.S. Constitution, and deprived Dustin of his federally protected right to be free from unlawful seizure and detention.

101. As a direct and proximate result of the aforementioned violations of Dustin's civil and constitutional rights actionable under 42 U.S.C. § 1983, Dustin suffered the serious and permanent injuries, damages, and death described herein.

14

102.    As a further direct and proximate result of the aforementioned violations of Dustin's civil rights, Brandi and Dustin's next of kin have and will continue to suffer the damages described above.

**FOURTH CAUSE OF ACTION**
(42 U.S.C. § 1983 – Excessive Force – Doughman)

103.    Plaintiff incorporates her previous allegations as if fully rewritten herein.

104.    Doughman, acting under color of law, used force as described herein on Dustin.

105.    Doughman's use of force on Dustin was unreasonable in light of the facts and circumstances at the time, most notably because they knew that he was experiencing a mental health crisis at all times in which they engaged with him.

106.    Doughman knew that using force presented a risk of harm to Dustin, but recklessly disregarded Dustin's safety by failing to take reasonable measures to minimize the risk of harm to him.

107.    As a direct and proximate result of the aforementioned violations of Dustin's civil and constitutional rights actionable under 42 U.S.C. § 1983, Dustin suffered the serious and permanent injuries, damages, and death described herein.

108.    As a further direct and proximate result of the aforementioned violations of Dustin's civil rights, Brandi and Dustin's next of kin have and will continue to suffer the damages described above.

**FIFTH CAUSE OF ACTION**
(42 U.S.C. § 1983 - Failure to Train – Buchanan)

109.    Plaintiff incorporates her previous allegations as if fully rewritten herein.

110.    At all times relevant to this action, Buchanan was responsible for making government policy and for oversight of the functions and duties of the MPD.

111.    Buchanan failed to establish adequate training programs in order to properly train his officers and employees to carry out their official duties in effectuating lawful seizures, detentions, high risk traffic stops, and for using lawful force on citizens.

112.    Buchanan's failures to adequately train his officers amounted to deliberate indifference to the fact that inaction would obviously result in the violation of citizens' Fourth Amendment rights to be free from unlawful searches, detentions, and unreasonable and excessive force.

113.    Buchanan's failure to adequately train MPD staff was a moving force behind the MPD officer's unlawful search, seizure, and detention of Dustin as well as the excessive force used against him.

114.    As a direct and proximate result of the aforementioned violations of Dustin's civil and constitutional rights actionable, Dustin was deprived of rights, privileges, and immunities secured to him by the U.S. Constitution.

115.    As a direct and proximate result of the aforementioned violations of Dustin's civil and constitutional rights, Dustin suffered the serious and permanent injuries, damages, and death described herein.

116.    As a further direct and proximate result of the aforementioned violations of Dustin's civil and constitutional rights, Brandi and Dustin's next of kin have and will continue to suffer the damages described above.

## SIXTH CAUSE OF ACTION
(42 U.S.C. § 1983 – Inadequate Supervision – Buchanan, Rosenbalm, Curlis, and Payne)

117.    Plaintiff incorporates her previous allegations as if fully rewritten herein.

118.    At all times relevant to this action, Buchanan was responsible for making government policy and for oversight of the functions of the MPD.

119.    At all times relevant to this action, Buchanan was afforded supervisory oversight of officers of the MPD.

120.    By virtue of their positions, Rosenbalm Curlis, and Payne were likewise afforded supervisory oversight of officers of the MPD.

121.    Buchanan, Rosenbalm, Curlis and Payne failed to adequately supervise the MPD officers and employees, including but not limited to Ledford and Doughman, in carrying out their official duties in effectuating the high-risk traffic stop of Dustin.

122.    The failures on behalf of Buchanan, Rosenbalm, Curlis and Payne to adequately supervise the officers and employees conducting the high-risk traffic stop of Dustin amounted to deliberate indifference to the fact that inaction and inadequate planning would obviously result in the violation of Dustin's Fourth and Fourteenth Amendment rights to be free from unlawful searches, seizures, arrests, detentions, and excessive force.

123.    As a direct and proximate result of the aforementioned violations of Dustin's civil and constitutional rights actionable under 42 U.S.C. § 1983, Dustin suffered the serious and permanent injuries, damages, and death described herein.

124.    As a further direct and proximate result of the aforementioned violations of Dustin's civil and constitutional rights, Brandi and Dustin's next of kin have and will continue to suffer the damages described above.

## SEVENTH CAUSE OF ACTION
### (42 U.S.C. § 1983 - Ratification – Buchanan)

125.    Plaintiff incorporates her previous allegations as if fully rewritten herein.

126.    At all times relevant to this action, Buchanan was responsible for making government policy and for oversight of the functions of the MPD.

127.    Buchanan ratified the conduct of the MPD officers which included the unlawful search, seizure, detentions, and excessive force used against Dustin.

128.    Buchanan's ratification was the moving force behind the violations of Dustin's civil rights described herein.

129.    As a direct and proximate result of the aforementioned violations of Dustin's civil and constitutional rights actionable under 42 U.S.C. § 1983, Dustin suffered the serious and permanent injuries, damages, and death described herein.

130.    As a further direct and proximate result of the aforementioned violations of Dustin's civil and constitutional rights, Brandi and Dustin's next of kin have and will continue to suffer the damages described above.

## EIGHTH CAUSE OF ACTION
(Violation of Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. – City of Monroe)

131.    Plaintiff incorporates her previous allegations as if fully rewritten herein.

132.    Titles II and III of the Americans with Disabilities Act (ADA) prohibit discrimination on the basis of disability in all programs, services and activities of public entities.

133.    To state a claim under the ADA, a plaintiff must allege that the person denied services (1) was disabled, (2) is otherwise qualified for the service, program, or activity of the entity, and (3) was discriminated against in that service, program, or activity solely on the basis of the disability.

134.    A disability is defined as (1) a physical or mental impairment that substantially limits one or more major life activities, (2) a record of such impairment, or (3) being regarded as having such an impairment.

135.    A plaintiff can establish a violation of the ADA pursuant to three theories: (1) disparate treatment, (2) disparate impact, and/or (3) failure to provide a reasonable accommodation.

136.    Defendant City of Monroe (Monroe) knew that Dustin suffered from a qualifying mental disability and/or regarded him as having such a disability.

137.    Monroe knew that its officers would encounter mentally ill citizens in the ordinary course of their official duties.

138.    Monroe, however, failed to adequately train its officers and implement policies to address the handling of mentally disabled citizens who require hospitalization but are otherwise not an imminent threat to themselves or others.

139.    Despite knowing that Dustin required reasonable accommodation of standard use of force policy to address mental health disability, Monroe failed to implement policy and training that provided for such accommodations.

140.    As a direct and proximate cause of Defendants' discrimination, Dustin suffered the serious and permanent injuries, damages, and death described herein.

141.    As a further direct and proximate result of the aforementioned violations of Dustin's civil and constitutional rights, Brandi and Dustin's next of kin have and will continue to suffer the damages described above.

## NINTH CAUSE OF ACTION
### (Wrongful Death-All Defendants)

142.    Plaintiff incorporates her previous allegations as if fully rewritten herein.

143.    Defendants' willful, wanton and/or reckless actions caused the wrongful death of Dustin described herein resulting in damages recoverable under Ohio Revised Code § 2125.02.

144.    As a direct and proximate result of Defendants' actions, Dustin suffered the injuries, damages, and ultimately death described herein.

145.    As a further direct and proximate result of Dustin's wrongful death, his survivors and/or heirs have suffered permanent damages, including but not limited to, the loss of his support, income, benefits, services, and society, including lost companionship, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, and education, as well as the loss of prospective inheritance.

146.    As a further direct and proximate result of Dustin's wrongful death, Dustin's survivors, next of kin and/or heirs have suffered permanent damages, including but not limited to, grief, depression, and severe emotional distress. They have incurred funeral bills and other expenses.

## TENTH CAUSE OF ACTION
**(Survivorship Action - All Defendants**)

147.    Plaintiff incorporates her previous allegations as if fully rewritten herein.

148.    As a direct and proximate result of Defendants' actions described herein, Dustin consciously experienced pain and suffering prior to his death.

149.     Damages for this conscious pain and suffering are recoverable under Ohio Revised Code § 2305.21.

**WHEREFORE,** Plaintiff respectfully demands judgment against Defendants greatly in excess of $75,000, jointly and severally, for compensatory damages to be proved at trial, punitive damages, reasonable attorney's fees, costs and all other relief to which she may be lawfully entitled.

Respectfully submitted,

/s/ Konrad Kircher

_____

Konrad Kircher (0059249)
Ryan J. McGraw (0089436)
RITTGERS & RITTGERS
12 East Warren Street
Lebanon, Ohio 45036
Tel.: 513/932-2115
Fax:  513/934-2201
konrad@rittgers.com
ryan@rittgers.com
*Attorneys for Plaintiff*

## JURY DEMAND

Plaintiff hereby demands trial by a jury of her peers as to all issues so triable herein.

/s/ Konrad Kircher

_____

Konrad Kircher (0059249)