UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

ADMINISTRATRIX BRANDI BOOTH,

       Plaintiff,                      Case No. 3:22-cv-197

vs.

JONATHON LAZZARA, D.O., *et al.*,        District Judge Michael J. Newman

       Defendants.

---

**ORDER: (1) DENYING PLAINTIFF'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT (Doc. Nos. 69, 71); (2) GRANTING DEFENDANT DOUGHMAN'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 80); (3) GRANTING THE MONROE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. No. 81); (4) DENYING DR. LAZZARA'S MOTION FOR SUMMARY JUDGMENT WITHOUT PREJUDICE TO RENEWAL IN STATE COURT (Doc. No. 78); (5) DISMISSING PLAINTIFF'S STATE LAW CLAIMS WITHOUT PREJUDICE; AND (6) TERMINATING THIS CASE ON THE DOCKET**

---

This civil case arises from the police shooting death of Dustin Booth, a resident of Monroe, Ohio. The shooting occurred during a police traffic stop when Dustin began to raise a revolver toward police officers. *See infra*, § I(F).

Plaintiff Brandi Booth ("Plaintiff"), Dustin's surviving spouse and administratrix of his estate, brings this case under 42 U.S.C. § 1983 claiming, in part, that certain City of Monroe Police Officers unlawfully detained and seized Dustin, and subjected him to excessive force, in violation of his rights under the Fourth Amendment to the United States Constitution. Doc. No. 1 at PageID 14-15. Defendants include Monroe Police Officers Drew Aspacher, Fred Doughman, Chief Robert Buchanan, Captain Brian Curlis, Lieutenant Mike Rosenbalm, Sergeant Caleb Payne, and the City of Monroe ("the Monroe Defendants").[1] *Id.* at PageID 14-19.

---

[1] Plaintiff and Defendants Payne and Ledford stipulated to the dismissal, without prejudice, of all claims against these two Defendants. Doc. No. 41.

Plaintiff also brings state law claims of wrongful death and survivorship claims against all Defendants, and a claim of negligence against Jonathan Lazzara, D.O.[2]  *Id*. at PageID 12-13.

The case is before the Court upon the parties' cross motions for summary judgment including Plaintiff's motions for partial summary judgment against the City of Monroe and Officer Doughman (Doc. Nos. 69, 71), the City's and Doughman's memoranda in opposition (Doc. Nos. 82, 80), and Plaintiff's replies (Doc. Nos. 83, 84).  Also pending are the Monroe Defendants' joint motion for summary judgment (Doc. No. 81), Officer Doughman's motion for summary judgment (Doc. No. 80), Plaintiff's memoranda in opposition (Doc. Nos. 92, 94), and the Monroe Defendants' and Doughman's replies (Doc. Nos. 97, 98). Also pending is Dr. Lazzara's motion for summary judgment (Doc. No. 78), Plaintiff's memorandum in opposition (Doc. No. 91), and Dr. Lazzara's reply (Doc. No. 95).  These motions are ripe for review.

## I.

The following factual review is based on deposition testimony with attached exhibits submitted by the parties in support of their pending motions and memoranda.

## A.

Plaintiff and Dustin began dating in 2005 while attending Monroe High School in Monroe, Ohio. After graduating from high school, they married and had two sons.  Doc. No. 59 at PageID 189, 198-99, 300 (Brandi Booth depo).

In 2006, Dustin earned an associate degree in business management and began working as a crane operator at AK Steel.  *Id*. at PageID 199, 242, 296, 298.  He worked a swing shift at AK Steel by working a one-week daytime shift, followed by a one-week evening shift, then a one-week night shift. *Id*. at PageID 244.  He also worked a second job at Rewind Roof and Exterior Cleaning.  *Id*. at 242-44.

---

[2] This Court has federal question jurisdiction over Plaintiff's federal claims, including those brought under 42 U.S.C. § 1983.  *See* 28 U.S.C. §§ 1331 and 1343(a)(3).  Plaintiff asserts that the Court has supplemental jurisdiction over her state-law claims.  Doc. No. 1 at PageID 6 (citing 28 U.S.C. § 1367).

He rarely missed work at AK Steel, calling off only twice over the next 13 years. *Id*. at PageID 246.

Dustin loved to spend time with his sons. Dustin's hobbies included fishing, playing basketball, and riding bicycles with his sons. *Id*. Plaintiff explained during her deposition, "There really wasn't much that he wanted to do without the boys." *Id*. at PageID 251. He also enjoyed family cookouts and family vacations in Florida, the Gulf Shores in Alabama, Hilton Head, and Myrtle Beach. *Id*. at PageID 249-51. Plaintiff and Dustin stored her father's gun collection in a locked cabinet in their home. *Id*. at PageID 253-54. They kept them mainly as mementos from Plaintiff's father. *Id*. at PageID 253. Dustin also owned two pistols, and he had a concealed carry permit. *Id*. at PageID 253, 256-57.

**B.**

Prior to the events leading to this case, Mr. Booth had no history of mental or emotional health problems.[3] Doc. No. 59 at PageID 262. Dustin was apparently feeling well in early January 2022 and was able to perform his work as a crane operator. *Id*. at PageID 298.

At some point in mid-to-late January 2022, he started exhibiting unusual behavior. *Id.* at PageID 298-303. He was not sleeping well and lost a significant amount of weight in a short time. He wrote nonsensical notes and began talking about the world being flat. *Id.* at PageID 294-304; Doc. No. 60 at PageID 542. He ordered a flat-earth map from Amazon. Doc. No. 59 at 298, 302-02, 429. Plaintiff testified, "It started out as he got interested in thinking the world was flat and he ordered a flat earth map off Amazon … and he'd just obsess and look at it for hours." *Id*. at PageID 429. "[T]hen it just got worse of him drawing … and thinking there was an ice bowl and it just gradually got worse." *Id*. He talked about the world being flat to his wife, their sons, and his mother. *Id*. at PageID 430.

On the evening of January 31, 2022, Plaintiff took Dustin's notebook in which he kept notes and his drawings of maps. *Id*. at 294. When Plaintiff did not return it to him, he "smacked" her in the face before leaving for work. *Id*. This was the first time he had ever done this to her. *Id*. at PageID 293-94.

---

[3] Dustin quit drinking beer in October 2021 and began using a THC vape pen. *Id.* at PageID 274-76, 283-87.

Plaintiff called her mother, Jodi Price, who then called Dustin.  Doc. No. 76 at PageID 2053 (Price depo.).  Ms. Price described the conversation she had with Dustin as "very unsettling."  *Id*.  Ms. Price testified, "[H]e kept me on the phone and said, you know, you need to listen to me.  You know, I've -- you know, I'm the chosen one and -- just delusional -- delusional conversation…. He had all the answers to the world. He -- his brain was like a computer.  That sort of thing."  *Id*. at PageID 1054.  Plaintiff and Ms. Price called the family doctor, who recommended calling the police.  Doc. No. 59 at PageID 312; Doc. No. 76 at PageID 2109-10.

The next day, February 1, 2022, Dustin stopped by his mother's home then returned to his home very early in the morning.  Doc. No. 59 at PageID 314-15, 318.  Plaintiff and Dustin sat in his truck and talked.  *Id*. at PageID 315, 319.  By this time, Dustin's mother had called the police.  *Id*. at PageID 315.  Several Monroe Police Officers arrived at the Booth home, including Sergeant Payne, Officer Gattermeyer, and Officer Doughman with his police dog.  Doc. No. 59 at PageID 319; Doc. No. 63 at PageID 1062-64.  The Officers talked to Dustin and Plaintiff.  Doc. No. 63 at PageID 1069.  After a while, a person with Butler County Mobile Crisis[4] arrived, spoke to Dustin, and decided he should be taken to the emergency room.  *Id*.  Police officers placed Dustin in handcuffs and transported him to the emergency room at Atrium Medical Center.  Doc. No. 59 at PageID 322-23; Doc. No. 87 at PageID 2765.

### C.

Jonathan Lazzara, D.O., an inpatient psychiatrist, treated Dustin during his stay at Atrium.  Dr. Lazzara described Dustin when he first examined him as exhibiting pressured speech and rapid thoughts with excessive amounts of energy.  Doc. No. 77 at PageID 2169 (Dr. Lazzara's depo).  Dusting looked like he had not been sleeping.  *Id*.  Dr. Lazarra described Dustin as, "Very polite, courteous.  He just was

---

[4] Butler County Mobile Crisis is "a county service organization that assists individuals with mental health issues."  Doc. No. 69 at PageID 1699.  It is available to assist law enforcement with interventions and "has authority to get more help for a citizen than can an officer."  *Id.*

4

a very, very nice man except when he first came in, he could not be slowed down." *Id*.

Dr. Lazzra diagnosed Dustin at admission with "bipolar disorder type 1 currently manic and anxiety." Doc. No. 87 at PageID 2765. He was treated with prescribed medication and supportive therapy. *Id*. at PageID 2766. He was discharged from Atrium on February 7, 2022 because he was no longer in a manic state and his symptoms were deemed to be under control with prescribed medication.[5] *Id*.; Doc. No. 77 at PageID 2176. Dustin assured his medical providers, including Dr. Lazzara, that he would properly take his medication, avoid alcohol and marijuana, and contact them if his symptoms worsened. Doc. No. 77 at PageID 2179-81, 2189. Plaintiff did not think Dustin was ready to come home at the time he was discharged. Doc. No. 59 at PageID 439-40.

### D.

Upon Dustin's discharge from Atrium, he did not immediately return to work at AK Steel. Doc. No. 59 at PageID 373-74. Plaintiff and Dustin began to work towards obtaining a short-term disability leave for him. *Id*. at PageID 374. Plaintiff testified that when Dustin phoned the Human Resources department at AK Steel on February 8th or 9th, he began rambling having been wrongfully arrested, held against his will, and tested for COVID without permission. *Id*. at PageID 375.

On February 9th, Dustin wanted to leave home and drive an hour away to buy a truck. *Id*. at PageID 380. Plaintiff thought that Dustin could not drive that far and make such an important financial decision, so she hid the keys to his truck. *Id*. Dustin became angry and threatened to smash Plaintiff's cellphone. When Plaintiff did not return the keys, Dustin struck Plaintiff's cellphone with a hammer. Plaintiff soon heard Dustin talking on the phone with the police. *Id*. at PageID 381. She took the phone from him and explained to the dispatcher that Dustin had been released from the hospital two days before. *Id*. She also informed the dispatcher that the police were "more than welcome to come over here." *Id*. She testified, "I just didn't feel like [Dustin] was safe to drive." *Id*.

---

[5] Previously, the parties stipulated to the voluntarily dismissal of all claims against Atrium. Doc. No. 46.

Monroe Police Officer Thomas Allen responded to the Booth home along with Ohio Highway Patrol Officers. *Id*. at PageID 381, 385. Dustin's mother also arrived there at some point. Both Plaintiff and Dustin's mother insisted to the Officers that Dustin needed to go back to the hospital. *Id*. at PageID 385.

Officer Allen testified that he spoke with Dustin about his desire to buy a truck, using "counseling type of wording" or he spoke in a "counseling manner." Doc. No. 64 at PageID 1187, 1191. Officer Allen further testified that Dustin was upset but calmed down. *Id*. at PageID 1192. Officer Allen did not take Dustin to the hospital because he did not see anything indicating Dustin was homicidal, suicidal, or might hurt Plaintiff or others. *Id*. at PageID1187. Officer Allen was not aware of any diagnosis that had been given to Dustin during his recent stay at Atrium. *Id*. He observed nothing in the situation that warranted calling Butler County Mobile Crisis. *Id*. at PageID 1201. Officer Allen gave Dustin the phone number for Access Counseling with Kathy Becker's name on it. *Id*. at PageID 1205. Becker is a law enforcement liaison with Access Counseling. *Id*. at PageID 1202.

**E.**

Two days later, on February 11, 2022, Plaintiff saw Dustin driving his truck around the neighborhood blaring music, honking the horn "obsessively," and throwing money out the window. Doc. No. 60 at PageID 566-67. She followed him and saw him drive in circles around a cul-de-sac honking his horn. *Id*. at PageID 567. He then drove out of the cul-de-sac, turned into another cul-de-sac, and again drove around honking his horn. *Id*. Plaintiff explains, "Then he got out of his truck and went into somebody's house[.]" *Id*. She called the police and asked for help. *Id*. at PageID 567-68. It was around 2:30 p.m. Doc. No. 66 at PageID 1362. She described to the police dispatcher what she had seen Dustin doing and told the dispatcher that she thought he was a danger to himself or others. Doc. No. 60 at PageID 568-69. She "just thought he was putting himself in bad situations and was worried about him and wanted him to get help." *Id*. at PageID 569. She also told the dispatcher "that he possibly could

6

have a gun in his truck and "that he was a CCW carrier."[6] *Id.*

While Plaintiff was on the phone with the dispatcher, she saw Monroe Police Officer Aspacher who was driving a marked police vehicle. *Id.* at PageID 570-72; Doc. No. 65 at PageID 1300.

Aspacher was responding to Plaintiff's 9-1-1 call. He testified, "I was dispatched to -- a female called in stating that her husband needs help, that he was in the hospital with some type of mental issue -- I can't recall exactly -- and that she was currently following him around, and she stated that he's throwing items out of the vehicle. I was very close in the area, and that's when I made contact with him initially." Doc. No. 65 at PageID 1289-90.

By the time Plaintiff saw Aspacher pull up to the intersection, Dustin had returned to his truck and was driving towards the four-way intersection at the exit of the cul-de-sac. Doc. No. 60 at PageID 573; Doc. No. 65 at PageID 1300. When Officer Aspacher arrived at the intersection, he activated the police cruiser's emergency lights and parked partially in the intersection. Doc. No. 65 at PageID 1300. Dustin approached the intersection in his truck and stopped. *Id.*

Officer Aspacher ordered Dustin to stop and said, "I need to talk to you[.]" *Id.* at PageID 1306. Dustin responded by saying something along the lines of, "[n]o … I don't want to talk with you  here. Follow me to my house[.]" *Id.* at PageID 1307. Dustin then drove away from the intersection. *Id.* at PageID 1307, 1309. This constituted, in Officer Aspacher's understanding, a failure to comply with a signal or order of a police officer, a misdemeanor. *Id.* at PageID 1305. Officer Aspacher understood his order telling Dustin to stop to be lawful "[b]ecause [he] was called there to intervene by a wife. A husband was in distress, basically." *Id.* at PageID 1308. Additionally, Officer Aspacher noted that he wanted to stop Dustin, and thus separate him from the public because Officer Aspacher's primary concern was public safety. *Id.*

Officer Aspacher and Plaintiff followed Dustin to the Booth home where Dustin parked in the

---

[6] Dustin held a CCW (carrying concealed weapon) license. Doc. No. 59 at PageID 255-58.

driveway and left his truck. *Id*. Officer Aspacher also parked nearby and his exited his vehicle. By that time, Officer Aspacher had learned from the dispatcher that Dustin held a CCW license. *Id*. at PageID 1313, 1315. Dustin did not indicate to Officer Aspacher whether he was carrying a firearm. *Id*. at PageID 1315. While standing near his vehicle, Officer Aspacher asked Dustin to come over because he needed to talk with him. *Id*. at PageID 1312, 1318-19. Dustin refused and went into the Booth's home. Doc. No. 60 at PageID 574; Doc. No. 65 at PageID 1319-20.

Backup officers soon arrived including Monroe Police Officers Worley and Ebbing. Doc. No. 65 at PageID 1323. Officer Aspacher used the public address system in his vehicle to attempt to contact Dustin. *Id*. Officer Aspacher explained, "I was just calm and approachable as I could be being a cop on a PA yelling at you. I said, Come on, man. We just want to talk to you. Just come out. Things like that." *Id*. at PageID 1324. Dustin closed the window blinds and Officer Aspacher was not able to contact or speak with Dustin after he entered the Booth home. *Id*. at PageID 1325. Other Monroe Police Officers arrived at the Booth home, and command of the scene transferred to the ranking officer as follows: Sergeant Myers, Lieutenant Beacock, Captain Curliss, and Chief Buchanan. *Id*.; Doc. No. 66 at PageID 1394.

Around 4:15 p.m., the Butler County Mobile Crisis Unit and representatives from the Crisis Intervention Team also arrived at the Booth home. Doc. No. 66 at PageID 1393, 1398. One of Dustin's friends, Justin Duh, arrived between 4:00 and 5:00 p.m. Doc. No. 74 at PageID 1940. Officer Duh was very good friends with Dustin. *Id*. at PageID 1946. Many other people had also arrived outside the Booth home, including Plaintiff, Dustin's mother and sister, and his cousin Josh and friend Jesse. Josh, Jesse, and Officer Duh had been in high school with Dustin. *Id*. at PageID 1943-44.

By then, Dustin had exited the Booth home and Mr. Duh briefly saw him. *Id*. at PageID 1940. Dustin was shirtless with marker writings all over his body. *Id*. at PageID 1940-41. He had a revolver on his waist at his side, not in his hand. *Id*. at PageID 1941-42. Officers did not arrest or challenge

Dustin at that time. Chief Buchanan instead decided to pull the officers back from the Booth home, except for officers in unmarked police cars, and hold a debriefing back at headquarters. Doc. No. 61 at PageID 745-46; Doc. No. 65 at PageID 1326.

**F.**

Officer Aspacher described the debriefing at headquarters: "They gave a little bit of background on Mr. Booth which I wasn't aware of until then, basically. It was just an overall just synopsis of what happened and what could happen further." Doc. No. 65 at PageID 1326-27. Officer Aspacher recalled, "they wanted to get [Dustin] in custody and get him help because they spoke to [Plaintiff] further and learned that he needed help, mental help." *Id*. at PageID 1327.

Sergeant Myers testified:

> So a debrief is basically a recap of what had happened up to that point and really the chief's justification of why we pulled off. You had numerous cops on the scene for … an extended period of time, and now we're not.
>
> So he was justifying the decision … of why we pulled off, what we were doing at the time with the unmarked in the area, and explaining his conversations that he had with family members, Mobile Crisis, negotiators, kind of bringing everybody up to speed that didn't really know what was going on at the time.

Doc. No. 61 at PageID 745.

The debriefing included Chief Buchanan and the Monroe Police Officers who had been at the Booth home during the afternoon, except for the officers who had remained at the Booth home in unmarked police cars. *Id*. at PageID 746. A plan developed during the debriefing to keep the officers in the unmarked police cars at the Booth home in case Dustin left the residence. *Id*. If that occurred, officers would be able to make contact with Dustin or perform a traffic stop. *Id*. During the briefing, the officers did not discuss if there would be a specific location for the traffic stop because there were too many variables they could not account for. *Id*. at PageID 749. Sergeant Myers testified, "So to say he would leave the house and we would stop him at this location, that was not a plan." *Id*. There was also not a plan to stop Dustin within a certain time frame. *Id*. at PageID 751. Chief Buchanan understood

that at the end of the debriefing there was a plan to "have Mr. Duh get Mr. Booth to leave the residence so a traffic stop could be done to take him into custody and get him to the hospital." Doc. No. 62 at PageID 953. Chief Buchanan testified, "[T]he ultimate goal was to get [Dustin] to the hospital to get him treated." *Id*. at PageID 955. There was no plan to bring Officer Doughman, with his police dog, to the traffic stop. Doc. No. 61 at PageID 756-57.

Back at the Booth home, at some point Mr. Duh walked to and knocked on the front door. Doc. No. 74 at PageID 1979. Dustin came to the door. He was shirtless and still had the writings on his body. *Id*. at PageID 1960. Dustin let Mr. Duh into the home. *Id*. Dustin talked about how he couldn't trust anyone and, according to Mr. Duh, "he started on a real weird tangent about weird stuff in the food and they were trying to kill him." *Id*. Mr. Duh noticed "guns all around," including both real guns and Nerf guns. *Id*. at PageID 1962-63. At times, Dustin calmed down but he would then start "saying crazy things … talking about being God, talking about being in charge of the world." *Id*. at PageID 1966. Mr. Duh left the Booth to get pizza for them. *Id*. at PageID 1972. Dustin did not want to leave the house. *Id*.

Mr. Duh did not make a plan with police; he was just trying to calm Dustin. *Id*. at PageID 1973, 1977-78. When Mr. Duh returned to the Booth home, Dustin was showered and fully dressed. *Id*. at PageID 1979. He let Mr. Duh into the home, and they ate pizza. *Id*. at PageID 1979, 1981-82. After that, Dustin wanted to leave the Booth home and visit his sister. *Id*. at PageID 1981-82. The two left but when they reached Mr. Duh's truck, Dustin said he was not leaving without a gun. *Id*. at PageID 1985. Dustin went back inside the house and put a revolver in a bag. When he returned to Mr. Duh's truck, he put the bag with the revolver behind the driver's seat. *Id*. at PageID 1985-86. Mr. Duh drove them away from the Booth residence with Dustin in the passenger's seat. *Id*. at PageID 1991.

Shortly thereafter, Officers performed a traffic stop on Mr. Duh's truck. *Id*. at PageID 1990. Dustin reached for the revolver, and Mr. Duh attempted to stop him from taking it. *Id*. at PageID 1991-92.

Before or near the time the traffic stop began, Officer Doughman arrived at headquarters to begin his shift. Doc. No. 63 at PageID 1075. Officer Doughman knew that officers had been at the Booth home earlier that day, but he did not know the details of what had occurred. *Id*. at PageID 1075-76. When Officer Doughman arrived at headquarters, Lieutenant Rosenbalm told him there will be a traffic stop, and he should go there with his police dog, Nelson.[7] Lieutenant Rosenbalm also told Officer Doughman, "you know what to do." *Id*. at PageID 1077. Doughman understood this to mean, "I know how to conduct myself and my dog at that traffic stop. So I knew that they were wanting to take him into custody … to get him to a hospital.... So my role was to have my dog up front as a display[.] [A] lot of times, it will … change someone's behavior. It will get them to comply with us just by that dog barking. It's basically … a show of force[.]" *Id*. at PageID1078.

Officer Doughman did not know any details of the plan for the traffic stop, other than the fact it was a high-risk traffic stop. *Id*. at PageID 1079-81. This, in general, meant that officers would not approach the stopped vehicle; its occupants would come to them. *Id*. at PageID 1082-83.

When Officer Doughman arrived near the location of the traffic stop, he was directed to move closer to Mr. Duh's truck. *Id*. at PageID 1083. Officer Doughman parked on the passenger side of Mr. Duh's truck, 15 or 20 feet behind it. *Id*. He exited the cruiser and, together with police dog Nelson on a leash, stood at its front headlight. *Id*. Sergeant Myers was present and in charge. *Id*. at PageID 762. Also present were Sergeant Caudill, Sergeant Payne, and Officers Halsey and Whitt. *Id*. at PageID 764.

Dustin and Mr. Duh were still in Dustin's truck when Doughman arrived. Doc. No. 63 at PageID 1084-85. Officers ordered Mr. Duh out of the truck and he complied. *Id*. at PageID 1085. Officer Doughman heard Officer Halsey say, apparently to Mr. Duh, "Have you been stabbed or are you stabbed[?]"[8] *Id*.; *see* Doc. No. 61 at PageID 765-66. Officer Doughman could see Dustin moving back

---

[7] Nelson is certified, through the State of Ohio, as a police canine officer. Doc. No. 63 at PageID 1153.
[8] Sergeant Myers later learned that Mr. Duh had not been stabbed. Doc. No. 61 at PageID 766.

and forth inside the truck. Doc. No. 63 at PageID 1084-85. As Mr. Duh exited the truck, Officer Doughman heard someone say, "He has the gun. He has the gun." *Id*. "[T]hat is the moment when Dustin then gets out of the passenger side and starts to walk away from the traffic stop," according to Officer Doughman. *Id*. Officer Doughman testified about what happened next:

> [N]ow that I've heard that … someone may have been stabbed, and then I heard he had a gun at this point. He [Dustin] is walking away. He's walking towards several open businesses, a lot of traffic in the intersection. There's cars that are coming up to the stop sign … [in] the direction he's walking.
>
> I make the decision to use a less than lethal option, and that was to send the dog to apprehend him, to stop him, slow him down so that we could take him into custody.

*Id*. at PageID 1087. Officer Doughman released Nelson, and Nelson ran toward Dustin's left side. *Id*. at PageID 1089. Dustin turned to his right to look back at the officers, and Nelson ran past him without making contact with him. *Id*. at PageID 1089-90. Nelson did not reengage Dustin. *Id*. at PageID 1090.

As Nelson ran through a nearby intersection, Sergeant Myers yelled, "No, no, no." Doc. No. 61 at PageID 765. Sergeant Myers was trying to convey that the officers "were not trying to use force on him [Dustin]." *Id*. Sergeant Myers testified, "I can't say that there was a calculated plan of everything that was going to happen from A to B. The plan of initiating the stop and then trying to take him into custody without force I would say was the ultimate goal." *Id*.

At this point, Officer Doughman moved towards Dustin with the intent to force him to the ground and take him into custody. Doc. No. 63 at PageID 1090. Officer Doughman explained, "I was meeting … the resistance he was giving me hand-on. I was going hands-on with him." *Id*. Officer Doughman did not see a weapon in Dustin's hand or on his body. *Id*. at PageID 1090-91. "So I was already right there at him. The best thing to do was just to grab a hold of him and to take him to the ground." *Id*. at PageID 1091. When this happened, Officer Doughman and Dustin fell to the ground. *Id*. at PageID 1155.

Officer Doughman saw Dustin "digging" in his waistband. *Id*. Dustin's right hand "got on a

12

grip" and Officer Doughman saw the "'chrome-plated cylinder' of a revolver." *Id*. At that point, Officer Doughman feared Dustin would shoot him or other officers. *Id*. As Dustin began to raise his gun toward officers, Officer Doughman and other officers fired. Dustin fell on his back. *Id*. He died later that evening.

## II.

Plaintiff's pending federal claims are:

1.  Unlawful seizure and detention in violation of the Fourth Amendment against the Monroe Defendants and Officer Doughman;

2.  Excessive force in violation of the Fourth Amendment against Officer Doughman;

3.  Failure to train against Chief Buchanan;

4.  Inadequate supervision against Chief Buchanan, Sergeant Rosenbalm and Sergeant Curlis;

5.  Ratification against Chief Buchanan;

6.  A violation of the Americans with Disabilities Act, 42 U.S.C., § 12101, *et seq.*, against the City of Monroe.

Doc. No. 1 at PageID 12-20.

Plaintiff's state law claims include:

1.  Professional negligence against Dr. Lazzara;

2.  Wrongful death under Ohio Rev. Code § 2125.02 against all Defendants; and

3.  a survivorship action under Ohio Rev. Code § 2305.21 against all Defendants.

As indicated above, the parties have filed cross motions for summary judgment.[9] Plaintiff seeks partial summary judgment on her excessive force claim against Officer Doughman. *See* Doc. No. 71. Plaintiff also seeks partial summary judgment on her ADA claim against the City of Monroe. *See* Doc. No. 69.

---

[9] The parties did not litigate any motions under Fed. R. Civ. P. 12(b)(6) or 12(c) and, instead, proceeded with discovery followed by filing their presently pending motions for summary judgment under Fed. R. Civ. P. 56. The parties have completed discovery. Mediation occurred on August 23, 2023 but was unsuccessful.

The Monroe Defendants, Doughman, and Dr. Lazzara seek summary judgment as to all claims against them.  *See* Doc. Nos. 78, 80, 81.

### III.

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that no genuine issue of material fact is present, and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The burden is on the moving party to conclusively show no genuine issue of material fact exists.  *Celotex*, 477 U.S. at 323; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).  The moving party must either point to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations … admissions, interrogatory answers, or other materials" or show "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  *See* Fed. R. Civ. P. 56(c)(1)(A) and (B).

A court considering a motion for summary judgment must view the facts and all inferences in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  However, "[t]he non-moving party … may not rest upon [his or her] mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial."  *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citations omitted).  "[T]here is no duty imposed upon the trial court to 'search the entire record to establish that it is bereft of a genuine issue of material fact.'"  *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 404 (6th Cir. 1992) (citations omitted).  Instead, "the free-ranging search for supporting facts is a task for which attorneys in the case are equipped and for which courts generally are not."  *Id.* at 406.

The Court's standard of review does not change when the parties file cross motions for summary judgment.  *See Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991).  "Rather, the court

must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994) (quoting *Taft Broadcasting,* 929 F.2d at 248).

IV.

Plaintiff's Fourth Amendment seizure and detention claim against Defendants Doughman, Buchanan, Rosenbalm, Curlis, and Aspacher focuses on the events that led to, and occurred during, the traffic stop on February 11, 2022. Plaintiff contends that the officers acted without probable cause or reasonable suspicion to believe that Dustin had committed a crime. Plaintiff brings this claim against these Defendants in their official and individual capacities.

Defendants Doughman, Buchanan, Rosenbalm, Curlis, and Aspacher contend that qualified immunity shields them from Plaintiff's Fourth Amendment seizure and detention claim and that, as a result, summary judgment in their favor is warranted on this claim. Doc. No. 80 at PageID 2364-65; Doc. No. 81 at PageID 2432-42.

A.

Plaintiff's federal constitutional claims arise under 42 U.S.C. § 1983. To succeed on a § 1983 claim, Plaintiff must establish: (1) a violation of Dustin's rights secured by the Constitution or laws of the United States; and (2) a person acting under color of state law violated his federal constitutional rights. *Littler v. Ohio Ass'n of Pub. School Emps.*, 88 F.4th 1176, 1180 (6th Cir. 2023). Only the first of the elements is at issue because the individual officer Defendants acted under the color of state law during the claimed violations of Dustin's constitutional rights.

"'Qualified immunity protects government officials performing discretionary functions unless their conduct violates a clearly established statutory or constitutional right of which a reasonable person in the official's position would have known.'" *Brown v. Lewis*, 779 F.3d 401, 411 (6th Cir. 2015) (quoting *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006)). "For a right to be clearly

15

established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Barber v. Miller*, 809 F.3d 840, 845 (6th Cir. 2015) (cleaned up); *see Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982). A case does not need to be "directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Ashcroft v. al–Kidd,* 563 U.S. 731, 741 (2011)). "[Q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

When facing a summary judgment motion based on qualified immunity, the plaintiff bears the burden to satisfy both prongs. *See Bunkley v. City of Detroit*, 902 F.3d 552, 559 (6th Cir. 2018). "In so doing, the plaintiff must, at a minimum, offer sufficient evidence to create a 'genuine issue of fact'; that is, 'evidence on which [a] jury could reasonably find for the plaintiff.'" *Id.* (alteration in original) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

"Reviewing courts may 'exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case.'" *Barber v. Miller*, 809 F.3d 840, 844 (6th Cir. 2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

**B.**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. "An ordinary traffic stop by a police officer is a 'seizure' within the meaning of the Fourth Amendment." *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008) (citing *Del. v. Prouse,* 440 U.S. 648, 653 (1979)). "In order to effect a traffic stop, an officer must possess either probable cause of a civil infraction or reasonable suspicion of criminal activity." *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012). "Probable cause is a reasonable ground for belief supported by less than prima facie proof but more than

16

mere suspicion." *Blair*, 524 F.3d at 748 (citing *United States v. Jackson,* 470 F.3d 299, 306 (6th Cir.2006)).

> It is well established that absent suspected criminal activity, a law-enforcement agent may not seize a person simply in order to assess his mental fitness. *McKenna v. Edgell,* 617 F.3d 432, 440 (6th Cir. 2010); *Fisher v. Harden,* 398 F.3d 837, 842 (6th Cir. 2005). As [the Sixth Circuit] explained in *Monday v. Oullette,* 118 F.3d 1099 (6th Cir. 1997), the Fourth Amendment protects individuals from state-sanctioned detention for a psychiatric evaluation absent "probable cause to believe that the person is dangerous to himself or others." *Id.* at 1102. In this context, a showing of probable cause "requires only a 'probability or substantial chance' of dangerous behavior, not an actual showing of such behavior." *Ibid.* (quoting *Illinois v. Gates,* 462 U.S. 213, 243 n. 13 … (1983)). When examining whether officers had probable cause to believe that an individual posed a danger, we have cautioned that "probable cause is a fluid concept-turning on the assessment of probabilities in particular factual contexts," *ibid.* (quoting *Gates,* 462 U.S. at 232 …), requiring courts to evaluate the facts known to officers from the perspective of a "reasonable and objective person" in those officers' position, *Fisher,* 398 F.3d at 843.

*Zucker v. City of Farmington Hills*, 643 Fed. App'x 555, 563 (6th Cir. 2016).

There is no genuine dispute concerning Dustin's conduct during approximately the mid-afternoon of February 11, 2022 and there is no doubt that his conduct gave Plaintiff plenty of reason to be concerned for his welfare and to call 9-1-1 for assistance. She saw Dustin driving around in his truck, blaring music, driving in and out of two cul-de-sacs, "obsessively" honking the horn, and throwing money out the window. *Supra*, § I(E). She told the dispatcher what she had seen Dustin doing. *Id.* She "just thought he was putting himself in bad situations and was worried about him and wanted him to get help." Doc. No. 60 at PageID 569. She also knew that Defendant had been recently hospitalized for mental-health difficulties. She told that dispatcher that Dustin might have a gun with him in truck and that he held a CCW license. *Id.*

When Officer Aspacher arrived and attempted stop Dustin's truck, Aspacher was responding to the 9-1-1 call made, based on what the dispatcher had told him, by a woman whose husband was in distress and had been throwing things from his truck. *Supra*, § I(E). Viewing these undisputed facts as an objective officer would, *see Monday*, 118 F.3d at 1102, there was a "probability or substantial chance"

that Dustin had engaged in dangerous behavior. Indeed, viewed objectively, Dustin had actually engaged in dangerous behavior. Consequently, probable cause supported Aspacher's decision to perform a traffic stop on Dustin's truck. *See id.* ("a showing of probable cause in the mental health seizure context requires only a 'probability or substantial chance' of dangerous behavior, not an actual showing of such behavior"). A reasonable and objective officer would likewise conclude, like Officer Aspacher did, that probable cause supported a traffic stop of Dustin's truck due to the probability or substantial chance of danger to public safety that Dustin presented. *See id.*

Aspacher also had probable cause to stop Dustin's truck after Dustin ignored Aspacher's request to talk with him and continued driving to the Booth home. Upon arriving there, Dustin exited his truck and again ignored Officer Aspacher's requests to remain outdoors so that they could speak with one another. Doc. No. 65 at PageID 1312-13; Doc. No. 60 at PageID 574; Doc. No. 68 at PageID 1602. Instead, Dustin went inside the home where he remained for approximately five hours.

By failing to stop his truck when Aspacher turned on his emergency lights, Dustin committed a misdemeanor crime in Officer Aspacher's presence—namely, failing to comply with a police officer's signal or order. *See* Ohio Rev. Code § 2921.331(A).

The existence of probable cause at this point is very significant because as the afternoon went on, officers learned additional information that, from an objective officer's viewpoint, confirmed the probability or substantial chance of danger that Dustin presented to himself and others. While at the Booth home on February 11, 2022, Officers made multiple attempts to get Dustin to come out of the house. *See supra*. Captain Curlis called Mobile Crisis to come to the Booth home to talk with Dustin because he had mental health issues and was inside the house with at least one firearm. However, Dustin would not talk to the crisis representatives and negotiators. Doc. No. 60 at PageID 577; Doc. No. 66 at PageID 1397-98. Dustin briefly came out on the porch of the Booth home with a holster and firearm.

18

Doc. No. 68 at PageID 1604. Officers learned that, in addition to the firearm he had on him, he had access to several more inside the house. Doc. No. 60 at PageID 577, 584.

During the debriefing, Chief Buchanan updated those at the meeting about his discussion throughout the afternoon with family members, Mobile Crisis, and negotiators. *See supra*, § I(F). Officer Aspacher recalled learning that Dustin had previously been on a mental evaluation hold, and he learned a cell phone was broken in a domestic dispute. Doc. No. 65 at PageID 1327. Officer Aspacher also recalled, "They [the supervising Officers at the debriefing] wanted to get [Dustin] in custody and get him help because they spoke to [Plaintiff] further and learned that he needed help, mental help." *Id*. at PageID 1327.

Viewed objectively, this information about the events earlier that day when Aspacher attempted to stop Dustin's truck, along with the information about Dustin discussed during the debriefing, confirmed the existence of probable cause to support the decision to stop Dustin's truck if and when he left the Booth home later on February 11, 2022.

For these reasons, construing the undisputed facts in Plaintiff's favor, she has not shown that Defendants Doughman, Buchanan, Lieutenant Rosenbalm, Curlis, and Aspacher violated Dustin's Fourth Amendment right to be free from unreasonable seizure and detention. In addition, in response to these Defendants' motions for summary judgment, Plaintiff has not cited a Fourth Amendment case that put these Defendants on notice that Aspacher's attempted traffic stop of Dustin's truck—or the later traffic stop—violated Dustin's clearly established constitutional rights. Doc. No. 94 at PageID 3207-12. Consequently, qualified immunity shields Defendants Doughman, Buchanan, Lieutenant Rosenbalm, Curlis, and Aspacher from Plaintiff's Fourth Amendment seizure and detention claim.

## C.

Plaintiff claims Chief Buchanan is liable under § 1983 for failure to adequately train the officer Defendants. Plaintiff also claims that Chief Buchanan, Lieutenant Rosenbalm, and Captain Curtis are

liable under § 1983 for the failure to adequately supervise the Defendant Monroe Police Officers, including Officer Doughman and Detective Ledford, in effecting the high-risk traffic stop of Dustin. Doc. No. 1 at PageID 16-17. However, Plaintiff's failure to show an underlying constitutional violation likewise means that her claims—for failure to train and/or supervise—cannot succeed. *See Hunsperger v. Tuscarawas Cty.*, No. 5:22-cv-00326, 2024 WL 3992275, at *4 (N.D. Ohio Aug. 24, 2024) (and cases cited therein).[10]

Further, Plaintiff asserts a claim of ratification under § 1983. Doc. No. 1 at Page ID 17-18, She alleges Chief "Buchanan ratified the conduct of the [Monroe Police] officers which included the unlawful search, seizure, detentions, and excessive force used against Dustin." *Id.*; *see* Doc. No. 94 at PageID 3217. She reasons "his ratification (indeed, initiation of the plan) was a moving force in causing the constitutional violation." Doc. No. 94 at 3217. Yet, without an underlying violation of Dustin's constitutional rights, a jury could not reasonably conclude that Buchanan's approval or initiation of the plan to perform a traffic stop on Dustin's truck ratified a constitutional violation. *Cf. Gregory v. Shelby Cty., Tenn.*, 220 F.3d 433, 442 (6th Cir. 2000) ("[A] plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." (quoting *Board of County Comm'rs of Bryan County, Okl. v. Brown,* 520 U.S. 397, 405 (1997))). Additionally, there is no indication in the record that Buchanan approved ahead of time Officer Doughman's decision to release police dog Nelson in order to seize or stop Dustin from walking away from the scene of the traffic stop or the officers' decisions to use deadly force when Dustin raised his revolver. As a result, Plaintiff's ratification fails. *See Feliciano v. City of Cleveland*, 988 F.2d 649, 656 (6th Cir. 1993) ("Ratification of a subordinate's

---

[10] Plaintiff's complaint does not raise a constitutional claim against the City of Monroe. Doc. No. 1. Assuming *arguendo*, that it does, the absence of an underlying constitutional violation likewise defeats a claim of municipal liability under § 1983 and *Monell*.[10] *See Chambers v. Sanders*, 63 F.4th 1092, 1101-02 (6th Cir. 2023) ("There can be no liability under *Monell* without an underlying constitutional violation").

action requires more than acquiescence—it requires affirmative approval of a particular decision made by a subordinate").

Plaintiff next claims that the City of Monroe violated Dustin's rights under the Americans with Disabilities Act ("ADA") by failing to accommodate his mental disability. Doc. No. 1 at PageID 18-19. Plaintiff contends that an accommodation could, and should, have included attempting to de-escalate the situation at Dustin's traffic stope or terminate Dustin's traffic stop upon learning of his mental disability. Doc. No. 94 at PageID 3217-18.

> Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "Two types of claims are cognizable under Title II: claims for intentional discrimination and claims for a reasonable accommodation." *Roell v. Hamilton Cty.*, 870 F.3d 471, 488 (6th Cir. 2017). As to the latter…, "[a] regulation implementing Title II requires a public entity to make 'reasonable modifications' to its 'policies, practices, or procedures' when necessary to avoid ... discrimination" based on disability. *Fry v. Napoleon Cmty. Schs.*, — U.S. —, 137 S. Ct. 743, 749 … (2017) (quoting 28 C.F.R. § 35.130(b)(7) (2016)). In other words, "Title II imposes affirmative obligations on public entities and does not merely require them to refrain from intentionally discriminating against the disabled." *Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 910 (6th Cir. 2004). Those obligations apply to "virtually everything a public entity does," *Johnson v. City of Saline*, 151 F.3d 564, 569 (6th Cir. 1998), but the "determination of what constitutes reasonable modification is highly fact-specific, requiring case-by-case inquiry," *Roell*, 870 F.3d at 489 (quoting *Anderson v. City of Blue Ash*, 798 F.3d 338, 356 (6th Cir. 2015)). And "overriding public safety concerns" can render the proposed accommodations unreasonable. *Roell*, 870 F.3d at 489 (quoting *Tucker v. Tenn.*, 539 F.3d 526, 536 (6th Cir. 2008)).

*Wilson v. Gregory*, 3 F.4th 844, 859–60 (6th Cir. 2021).

Assuming, without deciding, that Title II of the ADA could apply to police traffic stops in some situations, the possible reasonable accommodations of the stopped individual hinge on "overriding public safety concerns" under the particular facts the officers face. *Id*. ("Even if we assume that the ADA could apply in this situation, Deputy Gregory did not violate it").

In the present case, the overriding public safety concern that Dustin created render the ADA inapplicable. On this point, this Court agrees with the reasoning in *Hainze v. Richards*, 207 F.3d 795 (5th Cir. 2000):

> Title II does not apply to does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents, whether or not those calls involve subjects with mental disabilities, prior to the officer's securing the scene and ensuring that there is no threat to human life. Law enforcement personnel conducting in-the-field investigations already face the onerous task of frequently having to instantaneously identify, assess, and react to potentially life-threatening situations. To require the officers to factor in whether their actions are going to comply with the ADA, in the presence of exigent circumstances and prior to securing the safety of themselves, other officers, and any nearby civilians, would pose an unnecessary risk to innocents. While the purpose of the ADA is to prevent the discrimination of disabled individuals, we do not think Congress intended that the fulfillment of that objective be attained at the expense of the safety of the general public.

*Id*. at 801. This reasoning applies to the traffic stop of Dustin's truck due to the danger to public safety he presented, especially by his conduct that Plaintiff and the officers observed during the afternoon and at the traffic stop, by his refusal to exit the Booth home and talk with officers or the Mobile Crisis Unit, by his refusal to comply with officers' orders at the traffic stop, and given his access to guns inside the Booth home. *See supra*, § I(F). An overriding public safety concern also existed when Dustin began to walk away from the scene of the traffic stop towards a busy intersection and nearby businesses, and when he did not comply with the officers' orders to stop. Accordingly, the ADA does not apply and did not require the officers to accommodate Dustin's disability during the traffic stop. *See id*.

Plaintiff's motion for partial summary judgment on her ADA claim against the City of Monroe fails because she has not created a genuine issue of material fact concerning the events that led to, or occurred during, Dustin's traffic stop. Consequently, her motion for partial summary judgment against the City is **DENIED**.

Lastly, Plaintiff's claims against the Monroe Police Officers in their official capacity fail because the Eleventh Amendment insulates state employees acting in their official capacities from liability for

money damages.  *See Will v. Mich. Dep't of State Police,* 491 U.S. 58, 66-71 (1989); *see also Walker v. Norris*, 917 F.2d 1449, 1457 (6th Cir. 1990).

V.

Plaintiff claims Officer Doughman violated Dustin's right under the Fourth Amendment by using excessive force against him.  This occurred, according to Plaintiff, when Doughman released police dog Nelson to apprehend Dustin.  Doc. No. 71.  Plaintiff does not claim, however, that Doughman's (or any officer's) firing his weapon at Dustin when he began to raise his revolver constituted an excessive use of force in violation of the Fourth Amendment.  *See id*.

Plaintiff contends that summary judgment is warranted in her favor on her excessive force claim against Doughman.  In contrast, Doughman contends that summary judgment is warranted in his favor on this claim based on qualified immunity because (1) Plaintiff fails to demonstrate a violation of Dustin's clearly established constitutional rights; (2) Doughman's conduct did not violate a constitutional right; and (3) a reasonable officer in Doughman's position would not have known his conduct violated a constitutional right.  Doc. No. 80 at PageID 2358-72.

"The Fourth Amendment's prohibition against unreasonable seizures protects citizens from excessive use of force by law enforcement officers."  *Godawa v. Byrd*, 798 F.3d 457 (6th Cir. 2015) (citing *Cass v. City of Dayton*, 770 F.3d 368, 374 (6th Cir. 2014)).  To determine whether an officer used excessive force, courts consider  the totality of the circumstances the officer faced, *id*., and "whether the officer's actions were objectively reasonable in light of the facts and circumstances confronting them."  *Palma v. Johns*, 27 F.4th 419, 428 (6th Cir. 2022) (quoting *Estate of Hill v. Miracle*, 853 F.3d 306, 312 (6th Cir. 2017) (cleaned up)).

"In deciding whether the force used was excessive, [courts] balance the government's interests in protecting others (including the police) and curbing crime against a suspect's right to not to be injured.  Three factors are particularly relevant: (1) the severity of the crime at issue, (2) whether the suspect

posed an immediate threat to the safety of the officers or others, and (3) whether he was actively resisting arrest or attempting to evade arrest by flight." *Puskas v. Delaware Cty., Ohio*, 56 F.4th 1088, 1093-94 (6th Cir. 2023) (cleaned up) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Courts must consider the use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 397.[11]

Plaintiff contends that qualified immunity does not shield Doughman from her excessive force claim for the reasons advanced in her motion for partial summary judgment against Doughman. Doc. No. 92 at PageID 3195 (citing Doc. No. 71 at PageID 2358-72).

Although the parties have extensively briefed their many contentions regarding Doughman's release of police dog Nelson, the analysis is straightforward. "[T]he use of a properly trained police dog to apprehend a suspect does not carry with it a substantial risk of causing death or serious bodily harm." *Robinette v. Barnes*, 854 F.2d 909, 912 (6th Cir. 1988) (footnote omitted). Police dog Nelson demonstrated this. It is undisputed that Nelson failed to bite Dustin or make any contact with him and, instead, ran past him and did not attempt to reengage him. *See supra,* § I(F). Given this, Doughman's decision to release Nelson to apprehend Dustin ended up using no force at all on Dustin. Since no reasonable jury could find the use of no force to constituted an excessive use of force, Doughman is entitled to summary judgment on Plaintiff's claim that his release of Nelson constituted an excessive use of force.

---

[11] The Court recognizes that after the traffic stop occurred on February 11, 2022, the Sixth Circuit adopted several more factors to consider in cases involving use of force when officers respond to a mental health or medical emergency: "(1) whether the person was experiencing a mental health or medical emergency, and whether that emergency created 'an immediate threat of serious harm' to themselves or others; (2) whether 'some degree of force [was] reasonably necessary to ameliorate the immediate threat;' and (3) whether 'the force used [was] more than reasonably necessary under the circumstances.'" *Palma v. Johns*, 27 F.4th 419, 429 (6th Cir. 2022) (quoting *Estate of Hill v. Miracle*, 853 F.3d 306, 314 (6th Cir. 2017)). The parties, however, did not address these factors in their memoranda. Regardless, applying these factors, and given the imminent danger Dustin presented to the public and the officers, the Court finds that Doughman's release of Nelson and use of physical force to be reasonable under the totality of the circumstances.

Plaintiff also contends that Doughman's physical attack on Dustin, when he "threw [Dustin] to the ground," constituted an excessive use of force.  Doc. No. 71 at PageID 1875.  Yet, applying the above-listed factors to the situation Doughman faced does not assist Plaintiff.  First, by walking away from the officers instead of complying with their order to stop, Dustin was committing a misdemeanor offense.  Yet, Doughman faced more than a non-compliant misdemeanant.  Doughman knew that the officers were trying to apprehend Dustin for the purpose of taking him to a hospital due to the mental-health problems he had been experiencing earlier.  Doughman heard an officer ask Mr. Duh, as he exited the truck, if he had been stabbed.  Doughman also heard Mr. Duh yell that Dustin had a gun.  This information would have provided a reasonable officer in Doughman's position a basis for thinking that Dustin might have just stabbed Mr. Duh and/or that Dustin had a gun on his person.  As a result, the situation Doughman faced involved a serious crime that possible placed Mr. Duh in physical danger.[12] Knowing this, and seeing Dustin continue to walk away from the scene, and also knowing that Nelson had not stopped Mr. Duh from leaving the scene, a reasonable officer in Doughman's position could see Dustin as a growing and imminent threat to the officers and other people in the area as he walked toward a busy intersection and nearby businesses.  In the totality of these circumstances, the relatively low-level of physical force Doughman used (he "threw [Dustin] to the ground" in Plaintiff's view (Doc. No. 71 at PageID 1875) did not constitute an excessive use of force in violation of Dustin's Fourth Amendment rights.  *Cf. Calvert v. City of Steubenville*, *Ohio*, No. 2:19-cv-16, 2020 WL 886218, at *8 (S.D. Ohio Feb. 21, 2020) (finding no excessive force when an officer "reasonably, [but] incorrectly" believed the plaintiff committed an assault).

In addition, in her motion for partial summary judgment against Doughman and in her reply, and in her memorandum in opposition to Doughman's motion for summary judgment, Plaintiff has not pointed to a case that would have placed Doughman on notice that his actions in releasing Nelson and

---

[12] It later turned out that Mr. Duh had not been stabbed, but Doughman did not know this during the traffic stop.

tackling Dustin violated clearly established Fourth Amendment law at that time.[13] *Mullenix*, 577 U.S. at 12 (Courts "'do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate'") (cleaned up) (quoting *Ashcroft,* 563 U.S. at 741); *see* Doc. No. 71 at PageID 1870-74; Doc. No. 83 at PageID 2476-82; Doc. No. 92 at PageID 3195-98.

Because the undisputed facts fail to establish that Doughman used excessive force on Dustin in violation of his rights under the Fourth Amendment and because Doughman's use of force did not violate Plaintiff's clearly established Fourth Amendment rights, Doughman is entitled to qualified immunity and summary judgment on Plaintiff's excessive force claim. Considering Plaintiff's motion for partial summary judgment on its own, she has not created a genuine issue concerning the facts that led to Dustin's traffic stop or to Doughman's release of Nelson or his decision to throw Dustin to the ground. Given those undisputed facts, qualified immunity shields Doughman from Plaintiff's excessive force claim, and, consequently, Plaintiff's motion for partial summary judgment lacks merit.

## VI.

Plaintiff brings claims of wrongful death and survivorship under state law against all Defendants and a claim of professional negligence against Dr. Lazzara. Doc. No. 1 at PageID 12-13, 19-20. Defendants, including Dr. Lazzara, seek summary judgment in their favor on Plaintiff's state-law claims.

"Once a district court dismisses all of the claims over which it has original jurisdiction, it acts squarely within its discretion by declining supplemental jurisdiction over the remaining state law claims and dismissing them without prejudice." *Booker v. City of Beachwood*, 451 F. App'x 521, 522–23 (6th Cir. 2011) (cleaned up) (citing 28 U.S.C. § 1367(c)(3). To that end, the Sixth Circuit has held, "generally, once a federal court has dismissed a plaintiff's federal law claims, it should not reach state

---

[13] Plaintiff cites, and the Court has reviewed, *Palma v. Johns,* 27 F.4th 419 (6th Cir. 2022) (a post-February 11, 2022 case); *Graves v. Malone,* 810 Fed. App'x 414 (6th Cir. 2020); (finding excessive force where an officer shot an unconscious suspect in a bathtub); *Jacobs v. Alam*, 915 F.3d 1028 (6th Cir. 2019) (finding deadly force, not a canine deployment or other lesser force, excessive when a suspect merely possessed a firearm, without more); and *Woodcock v. City of Bowling Green*, 679 F. App'x, 419 (6th Cir. Feb. 16, 2017) (same). *See* Doc. No. 92 at PageID 3195-98.

law claims." *Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 521 (6th Cir. 2007) (cleaned up) (citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)); *see Mt. Pleasant Blacktopping Co., Inc. v. Greene Cty., Ohio*, No. 3:18-cv-417, 2021 WL 718843, at *6 (S.D. Ohio Feb. 24, 2021).

As explained above, Defendants are entitled to summary judgment on all of Plaintiff's federal claims, and Plaintiff is not entitled to summary judgment (partial or otherwise) on any of her federal claims. Her only remaining claims arise under state law. In these circumstances, declining to exercise supplemental jurisdiction over Plaintiff's claims is warranted. Accordingly, Plaintiff's state law claims are **DISMISSED WITHOUT PREJUDICE**. *See Musson Theatrical v. Fed. Express Corp.*, 89 F.3d 1244, 1254-55 (6th Cir. 1996) ("[w]hen all federal claims are dismissed before trial, the balance of considerations will usually point to dismissing the state law claims, or remanding them to state court if the action was removed"); *see also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial ... the state claims should be dismissed as well"); *Aquilina v. Wrigglesworth*, 759 Fed. App'x 340, 348 (6th Cir. 2018) (citation omitted) (In the interest of fairness, "[a] state court should have the opportunity to consider the merits of Plaintiff[s'] state law claim").

## VII.

For the reasons stated herein, Defendants' motions for summary judgment (Doc. Nos. 78, 80, 81) are **GRANTED**, and Plaintiff's cross motions for partial summary judgment (Doc. Nos. 69, 71) are **DENIED**. Plaintiff's state law claims are **DISMISSED WITHOUT PREJUDICE**. This case is **TERMINATED** on the docket.

**IT IS SO ORDERED.**

September 30, 2024                    s/*Michael J. Newman*
                                     Hon. Michael J. Newman
                                     United States District Judge